

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| BRANNON H. SIRMON, et al., | ) | |
| | ) | |
| Plaintiffs; | ) | |
| | ) | |
| vs. | ) | 7:10-cv-2717-LSC |
| | ) | |
| WYNDHAM VACATION | ) | |
| RESORTS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## Memorandum Opinion

## I.    Introduction

Before the Court are three motions for summary judgment filed by Defendants on August 10, 2012. (Docs. 124, 127, & 130.) The first seeks summary judgment on claims asserted by Plaintiffs Brannon and Spencer Sirmon. (Doc. 124.) Plaintiffs do not oppose this motion (Doc. 160 at 1 n.1), and therefore, it is due to be GRANTED. The second motion seeks summary judgment as to all claims asserted directly against Defendant Resort Condominiums International, LLC ("RCI"). (Doc. 127.) This motion is also unopposed (Doc. 160 at 1), and thus due to be GRANTED. The remaining motion (Doc. 130), which challenges the claims asserted by Plaintiffs

Richard and Cynthia Sirmon, has been fully briefed and is ripe for decision. For the reasons described below, this Motion for Summary Judgment (Doc. 130) is due to be GRANTED in part and DENIED in part.

## II.   Facts[1]

Defendant Wyndham Vacation Resorts, Inc. ("WVR") is a wholly-owned subsidiary of Wyndham Vacation Ownership ("WVO"; collectively "Wyndham"), one of the world's largest timeshare companies.[2] Wyndham develops, markets, and sells vacation ownership interests, and provides consumer financing to owners. Ownership interests are reflected by an allocation of "points" proportionate to each owner's interest. These points can then be used to make reservations at various resorts.

Plaintiffs Richard and Cynthia Sirmon are among Wyndham's top point holders, presently owning approximately 23,000,000 points. Plaintiffs accumulated their points through direct purchases from Wyndham and also by purchasing points

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[2] Wyndham was formerly known as Fairfield Resorts, Inc. However, for purposes of continuity the Court will always refer to the timeshare company as Wyndham.

from third party owners. Plaintiffs first purchased timeshare interests from Wyndham in August 1999. Over the next eight and a half years, Plaintiffs repeatedly purchased additional timeshare interests. Plaintiffs' last purchase from Wyndham occurred on or about April 26, 2008.

Wyndham has an internal sales compliance manual that establishes standards for sales presentations. That manual explicitly describes a variety of prohibited sales practices. One sales tactic explicitly prohibited is promoting rental of points as a reason for purchasing additional timeshare units. Specifically, the manual provides:

- Discussing the likelihood of an owner being able to rent the product or the amount an owner could expect to receive for the rental of the product is prohibited.
- Providing examples, third party experiences, and opinions regarding the amount an owner could expect to receive, or indicating that owners typically receive a certain amount of money when renting their timeshare is prohibited.
- Suggesting that an owner can rent their timeshare to cover their maintenance fees or that an owner can pay for their purchase by renting out their timeshare is prohibited.
- Recommending or endorsing a particular rental company is prohibited.

(Doc. 146-6 at 3[3].)

Plaintiffs allege that, notwithstanding these prohibitions, Wyndham sales representatives regularly promoted rental when encouraging them to make additional

---

[3] Unless otherwise noted, pinpoint citations refer to CM/ECF document stamp pagination.

purchases. Plaintiffs' allegation is supported by the testimony of several former Wyndham employees, who testified that, with encouragement from management, sales representatives would discuss: (1) specific amounts owners could expect to receive from renting (Martin Depo., Doc. 146-7 at 222); (2) the likelihood of being able to rent (Bonds Depo., Doc. 146-11 at 31); (3) third-party experiences about amounts owners could expect to receive from renting (*id.* at 53); and (4) that the owner can cover expenses and maintenance fees from revenue generated by renting. (*Id.* at 33.) Former Wyndham employee Paul Bonds[4] testified that the "rental pitch" was used the entire time he was employed by Wyndham. (Bonds Depo., Doc. 146-11 at 32.) Further, when asked who at Wyndham was aware the rental pitch was being used, Bonds stated: "Everybody, all staff, salespeople, managers, director of sales, vice presidents, that's as far as I know, as high up as that." (*Id.* at 40.) Similarly, former Wyndham employee Tom Martin[5] testified that "sales representatives were instructed by their managers to promise rental income to owners, sometimes in the thousands of dollars." (Martin Depo., Doc. 146-7 at 222.)

As Plaintiffs accumulated more and more points, they became eligible for

---

[4] Paul Bonds worked for Wyndham between 2003 and 2010, serving in various positions, including in-house sales representative, frontline manager, and focus manager.

[5] Tom Martin worked for Wyndham during 2007 and 2008 as a front line salesman and senior exit takeover salesman.

membership in the FairSharePlus VIP Program ("VIP Program"). The VIP Program had three levels—VIP, VIP Gold, and VIP Platinum—with each membership level offering benefits not available at the level below. Plaintiffs assert that Wyndham promised them a variety of benefits associated with their VIP Program status including, but not limited to, VIP benefits for guests, unlimited free guest certificates, favorable cancellation policies, free room upgrades, and the ability to transfer points to other owners. Furthermore, Plaintiffs allege they were repeatedly assured that the promised benefits would always be available, and that any change to the benefits would be for the better. This allegation is supported by the testimony of former Wyndham employees, including the testimony of Paul Bonds, who admitted that he told Plaintiffs they would be grandfathered in to all benefits available at the time of their purchase. (Bonds Depo., Doc. 146-11 at 202; *see also* Martin Depo., Doc. 146-7 at 161–62; Santore Depo., Doc 146-10 at 105–06.) VIP benefits were particularly advantageous to owners, like Plaintiffs, who were using their points to operate vacation rental businesses, and Plaintiffs contend that the prospect of obtaining these benefits heavily influenced their decision to continue accumulating points.

Every year Wyndham publishes a member's directory, which details program benefits available to Wyndham owners and the rules for membership in Club

Wyndham. Plaintiffs acknowledged receipt of the then current directory in 2001, 2005, 2007, and 2008. The member directories are voluminous publications that range between 250 and 400 pages in length, depending on the year. Included within each directory is a one-page table outlining the VIP Program benefits available to VIP owners. In 2003, Wyndham placed a small-print disclaimer at the bottom of the VIP Program benefits table which provided: "[b]enefits are subject to change without notice."[6] (Doc. 132-14 at 29.) In 2006, Wyndham modified the disclaimer to state: "[b]enefits are subject to change *or elimination* without notice." (Doc. 132-44 at 18, emphasis added.)

The evidence submitted demonstrates that Wyndham was aware that Plaintiffs, who owned more than 20 million points, were using their points to operate a for-profit rental business. Indeed, sales representatives admitted describing Plaintiffs' rental success when using the rental pitch to convince other owners to purchase additional points. (*See* Bonds Depo., Doc. 146-11 at 53.) However, despite Wyndham's knowledge that Plaintiffs' were making investment-oriented purchases, Wyndham drafted documents for Plaintiffs to sign which asserted that the purchases were made

---

[6] Plaintiffs assert that the "subject to change" provision was not included in directories published prior to 2003. (Doc. 145 at 47.) The Court, however, has not been provided any directories published before 2003, and therefore cannot determine when this provision was first included.

for non-investment purposes.[7] For example, on at least three occasions, the first of
which in August 2001, Plaintiffs signed an affidavit stating:

> We acknowledge that the purchase of the Property interest dedicated to
> the Trust Agreement was NOT made for investment purposes but to use
> for pleasure and vacations.

(Doc. 132-2 at 3 ¶ 5; Doc. 132-2 at 41 ¶ 5; Doc 132-5 at 17 ¶ 5.)

There is evidence that also indicates that Wyndham was aware that Plaintiffs
were making purchasing decisions, at least in part, based on promises and
representations made by Wyndham sales representatives. Indeed, when asked whether
customers relied on the rental pitch when making purchases, Paul Bonds stated:
"They totally relied on it 100 percent." (Bonds Depo., Doc. 146-11 at 31; *see also*
Santore Depo., Doc 146-10 at 106.) Nonetheless, the contract documents provided
that such oral representations were not considered part of the purchase agreements.
On ten separate occasions, the first of which was in August 2001, Plaintiffs made the
following attestation contemporaneous with a purchase from Wyndham:

> We . . . acknowledge that prior to signing the contract or agreement we
> were provided [various] documents . . . and understand that we should
> not rely on any representations other than those contained in said

---

[7] A considerable number of contract documents are included within the evidentiary
submissions in this case. While much of the contractual language is repeated from one transaction
to another, there does not appear to have been a standard form agreement that was used for every
sale.

documents.

(*See* Doc. 133 n.2.)

Additionally, many of the contract documents contained merger clauses stating that oral promises were unenforceable. The following merger clauses are exemplary of clauses found throughout the timeshare contracts:

> This agreement supersedes any and all understandings and agreements between You and Us, and You and We mutually agree that this Agreement represents the entire Agreement between You and Us, and any representation or inducement which is not set forth in this Agreement shall be of no force and/or effect. This Agreement may only be amended or modified by an instrument in writing between the parties.

(Doc. 132-7 at 50 ¶ 17.)

> The Contract constitutes the entire agreement between Seller and Buyer, and each represents and warrants that no representation, written or oral, has been made by either of them to the other, except as expressly set forth herein. No presentation, warranty, undertaking or promise, whether oral, implied or otherwise, has been made by Seller or by its agents, employees or brokers or salesmen, or by Buyer to anyone except as expressly set forth in a written agreement signed by both parties.

(Doc. 132-8 at 13 ¶ 13.)

As early as 2005, Wyndham began identifying problems associated with allowing large point owners, known as "Megarenters,"[8] to operate for-profit rental

---

[8] Wyndham employees periodically used the term "Megarenter" to describe high-volume owners, like Plaintiffs, who used their points to operate rental businesses. The origination of the term and the scope of its use are unclear. The Court uses the term in this opinion as a matter of

businesses with their points. A Wyndham internal presentation, dated November 11, 2005, noted that the company "currently supports owners running rental businesses." (Doc. 146-26 at 3.) However, because of the negative effect Megarenters were having on Wyndham's business, the presentation recommended "limit[ing] [rental] transactions" and "tighten[ing] rules" that allowed renting to persist. (Doc. 146-29 at 5.)

In March 2006, a Wyndham employee delivered another presentation related to the Megarenter issue. This presentation, titled "Rental Abuse Recovery Strategy," focused more directly on the rules that would need to be changed to alleviate the problems created by Megarenters. (Doc. 146-23.) Specifically, the presentation recommended altering many of the VIP Program benefits available to Megarenters, including limiting the number of free guest confirmations available to VIP owners, changing the liberal VIP cancellation policy, and limiting the ability of VIP owners to upgrade their rooms.

Many of the VIP benefit changes discussed in the March 2006 presentation took effect on July 15, 2006. (*See* Doc. 132-48.) One rule revision impacted the ability of VIP owners to upgrade their units prior to check-in. Before the rule change, VIP

---

convenience, not for any legal significance.

owners could upgrade their reserved units multiple times to the largest possible unit available. The revised rule only allowed for one upgrade to "the next larger unit available." (Doc. 132-48 at WVR/WVO 05665.) Another change related to the complimentary guest confirmations. Prior to the 2006 modification, VIP members had unlimited free guest confirmations. The new rule, however, added a caveat that the complimentary guest confirmation only applied if the guest was traveling with a VIP member. (*Id.*)

Plaintiffs apparently learned about these changes before they ever took effect. On May 29, 2006, Plaintiffs sent an email to Fran Santore,[9] expressing displeasure with the upcoming changes. Plaintiffs stated that Wyndham was performing a "bait and switch" by rescinding benefits that Plaintiffs had spent more than $500,000 to acquire. (Doc. 132-49 at 20.) In a follow up email, Plaintiffs stated that Wyndham was "making it pretty clear that they don't want owners like me and that they think they can change the VIP rules anytime they want to." (*Id.* at 18.)

The extent to which these benefit changes were actually enforced is unclear. In his deposition, Plaintiff Richard Sirmon stated that "Wyndham went back and

---

[9] Fran Santore is a former Wydham employee who held various positions in the sales department. When Santore left Wyndham in 2009 or 2010, he was the Vice President of Sales. It is not exactly clear what Santore's position was in 2006, but the indication from his deposition is that he was an in-house salesman.

[reversed the guest confirmation change] after there was an uproar." (Sirmon Depo., Vol. 1, Doc 132-50 at 64.) Such a reversal would be consistent with other instances where Plaintiffs claim that they were able to have benefits restored after complaining that Wyndham was taking an action that appeared contradictory to promises made by the company. For example, on October 5, 2007, Mr. Sirmon wrote an email to complain about Platinum VIP benefits being inappropriately withheld from many of his points. In the email, Mr. Sirmon wrote that there had been a "long string of deletions of one VIP benefit after another being taken away from what [he] bought into that Wyndham was selling." (Doc. 132-49 at SIRMON 12221.) The Wyndham representative responded the same day, and stated: "Wyndham Vacation Resorts is committed to member satisfaction and truly values its VIP owners. Therefore, I have made a decision to reinstate your VIP Platinum status . . . ." (*Id.* at 12220.)

However, even if the 2006 changes were not entirely undone, Plaintiffs contend that Wyndham representatives continually assured them that everything would work out. Indeed, in response to Plaintiffs' email regarding the 2006 changes, Santore stated "I know [Wyndham] is looking at another level of ownership called Diamond (2 million points). Maybe this level of ownership will allow us to do what we need and we can re-arrange things. If not, I will find a way around this." (Doc. 132-49 at 18.)

Paul Bonds testified that he also made representations to Plaintiffs regarding Diamond level ownership.[10] (*See* Bonds Depo., Doc 146-11 at 201–02.) Bonds admitted that Diamond level ownership was completely made up by Wyndham as a sales pitch to sell more units to previously existing owners. (*Id.* at 131.) Furthermore, Bonds acknowledged in his deposition that he knew his representations about Diamond level ownership were false at the time they were made. (*Id.* at 202.) Mr. Sirmon testified that he believed Santore and Bonds were telling the truth, and that the benefit changes would not stand, or at the least, Diamond level ownership would create a work-around for the new modifications. (*See* Sirmon Depo., Doc. 146-60 at 103.)

The VIP rule changes adopted in 2006 were not the only alterations which impacted owners' rental operations. In 2007, Wyndham implemented additional changes which had the effect of restricting rental activity. For example, Wyndham announced that it was removing the unlimited free guest certificates previously given to VIP owners and replacing this benefit with a tiered system where VIP owners received 5 free guest confirmations per year, VIP Gold owners received 10 free guest confirmations per year, and VIP Platinum owners received 15 free guest confirmations

---

[10] It does not appear Plaintiffs were ever provided specific information about how Diamond level ownership would work to remedy their issues. Rather they were just loosely informed that it was coming and that this level of ownership would ensure Plaintiffs were grandfathered in to all benefits.

per year for every million points owned. As with the earlier changes, Plaintiffs contend they were again assured by Wyndham's representatives that the changes would not remain in force with respect to their accounts.

Then, in a letter dated October 7, 2008, Wyndham informed Plaintiffs that further changes were being made to the VIP Program benefits. The primary modification was a dramatic increase in the guest confirmation fee for all confirmations in excess of the limited annual complimentary allotment. These changes became effective October 15, 2008, and, unlike prior modifications, it appears these changes were fully enforced. In a "Mega Renter Project" meeting held on January 26, 2009, Wyndham noted that these rules and regulations were "put in place to impact Megarenters," and to "thwart the impact of the Megarenters on their business." (Doc. 146-38 at 2, 3.) In an internal email, a Wyndham employee, Amy Minton, noted these changes were "implemented to impact the profitability of the Megarenter's rental activity." (Doc. 146-39 at 3.)

In October 2009, Plaintiffs sent Wyndham a demand letter, wherein they set out their issues with Wyndham's actions and threatened legal action against the company. Senior Vice President Deanne Gabel responded to Plaintiffs' demand letter by email on November 3, 2009:

Mr. Sirmon,

We have collectively had an opportunity to go through your communication and have agreed to address each of these issues independently. As is our protocol, only those issues related to an Attorney General's office or other legal representation will be addressed by our legal department, and all others we are going to divide on [sic] conquer. We will be responding to you however in a complete collaborative response, however this will take some time as there is a substantial amount of research that needs to occur.

(Doc. 146-62 at 2.) After Plaintiffs responded that they would "await a report" (*id.*), Ms. Gabel reported to her team that she had "bought . . . some time with Mr. Sirmon." (*Id.* at 4.) Plaintiffs assert they never received a meaningful response to their demand letter. Plaintiffs filed this suit on October 7, 2010. (Doc. 1.)

## III.   Standard.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[11] The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

---

[11] Although Fed. R. Civ. P. 56 was amended on December 1, 2010, "the standard for granting summary judgment remains unchanged." Fed. R. Civ. P. 56 advisory committee's note (2010 Amendments).

The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also* Fed. R. Civ. P. 56(c). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp.*, 281 F.3d at 1224 (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## IV.   Analysis

Defendants assert that summary judgment is due to be granted on each of Plaintiffs' claims because they are legally barred for various procedural or substantive reasons. Each of Plaintiffs' claims for relief will be addressed in turn below.

### A.    Fraud and Fraudulent Inducement

Although Plaintiffs' amended complaint sets out twenty six separately identifiable fraud allegations, it appears, at this stage, that Plaintiffs have conceded all but two of those claims. Defendants individually addressed each of Plaintiffs' fraud allegations in their Memorandum in Support of Summary Judgment, attempting to establish why they are entitled to judgment as a matter of law as to each one. Plaintiffs, however, only responded to two of those claims, stating that their "fraud claims boil down to two representations: (1) that Plaintiffs could rent their points to run a rental business with the support of Wyndham's systems, benefits and facilities and (2) that Plaintiffs' benefits would not change except for the better." (Doc. 145 at 41.) As a matter of convenience, the Court will refer to these two fraud claims as the "Rental Fraud" and the "Benefits Fraud."

The Eleventh Circuit has stated that a plaintiff's failure to support a claim constitutes abandonment of that claim. *See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("[F]ailure to brief and argue [an] issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (claim that was included in complaint but not again raised

until the plaintiff's supplemental reply brief is abandoned). Thus Plaintiffs have forfeited all fraud claims set out in their amended complaint other than the Rental Fraud and the Benefits Fraud.[12]

###    i.    Statute of Limitations

Defendants assert that Plaintiffs' two fraud claims are barred by the statute of limitations.[13] Alabama's statute of limitations for claims based upon fraud or fraudulent inducement is two years. *See* Ala. Code § 6-2-38(l); *Liberty Nat'l Life Ins. Co. v. Parker*, 703 So. 2d 307, 308 (Ala. 1997) (citing Ala. Code § 6-2-38(l)) ("The statute of limitations for fraud actions generally allows two years for filing a claim."). The two-year limitations period begins to run when a plaintiff is privy to facts which would "provoke inquiry in the mind of a [person] of reasonable prudence, and which, if followed up, would have led to the discovery of the fraud." *Auto-Owners Ins. Co. v.*

---

[12] These two fraud claims are not entirely independent of one another. For example, Plaintiffs claim that their rental business was achievable in large part because of the availability of VIP Program benefits. Thus, Wyndham's promise to provide and maintain VIP Program benefits could also be deemed a promise to help facilitate Plaintiffs' rental business. Likewise, Plaintiffs' knowledge that VIP Program benefits were being removed could have also put them on notice that Wyndham was repudiating its promise to help Plaintiffs run a rental business. Nevertheless, to the extent possible, the Court will treat these as two distinct fraud claims.

[13] Defendants also argue that Plaintiffs' suppression claim is barred by the statute of limitations: "Plaintiffs' suppression claim is based on the same underlying facts [as the fraud claims], and as such, it is also time barred." Because Defendants did not make any individualized statute of limitations arguments with respect to Plaintiffs' claim for fraudulent suppression, the analysis in this section applies equally to that claim. Defendants' substantive challenges to Plaintiffs' suppression claim are addressed in Section IV.C., *infra*.

*Abston*, 822 So. 2d 1187, 1195 (Ala. 2001) (quoting *Willcutt v. Union Oil Co.*, 432 So. 2d 1217, 1219 (Ala. 1983)). Plaintiffs filed this action on October 7, 2010. Thus, Plaintiffs' claims are time barred if the statute of limitations began to accrue on Plaintiffs' claims more than two years before that date.

"[T]he question of when a party discovered or should have discovered the fraud is generally one for the jury." *Gilmore v. M & B Realty Co., L.L.C.*, 895 So. 2d 200, 210 (Ala. 2004) (quoting *Parker*, 703 So.2d at 308). However, the question of when a plaintiff discovered or should have discovered the fraud may be "'removed from the purview of the jury' and decided as a matter of law in cases where the plaintiff had actual knowledge of facts that would have put a reasonable person on notice of the fraud." *Cork v. Marriott Int'l, Inc.*, 426 F. Supp. 2d 1234, 1239 (N.D. Ala. 2006).

Defendants initially assert the statute of limitations clock started when Plaintiffs received their contract documents because the documents contradict the oral representations and thus should have put Plaintiffs on notice of the fraud. (Doc. 133 at 7–12.) In *Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 421 (Ala. 1997), the Alabama Supreme Court returned to an objective standard for evaluating fraud claims and imposed a "general duty on the part of a person to read the documents received in

connection with a particular transaction." Thus, under *Foremost*, the question of when a plaintiff should have discovered the fraud may be removed from the purview of the jury and decided as a matter of law when the plaintiff received documents in connection with the transaction that should have alerted him to the possibility of fraud.[14] *See, e.g., Auto-Owners Ins. Co. v. Abston*, 822 So. 2d 1187, 1195–96 (Ala. 2001); *Owens v. Life Ins. Co. of Georgia*, 289 F. Supp. 2d 1319, 1325–26 (M.D. Ala. 2003).

The Court is not convinced that the contract documents received by Plaintiffs were sufficient to put Plaintiffs on notice of the fraud such that the statute of limitations clock then started to run. Defendants identify several contractual provisions, each of which fail the *Foremost* objective test for one reason or another.

The first contractual provision cited by Defendants is a signed purchaser's affidavit containing a merger clause. The clause provides that Plaintiffs "should not rely on any representations other than those contained in [the contract] documents." (Doc. 133 at 9.) Merger clauses may bar evidence of oral representations offered in support of a contract claim. However, commonplace merger clauses are insufficient

---

[14] There is considerable overlap between Defendants' argument that Plaintiffs' possession of certain documents should have activated the statute of limitations and Defendants' argument, discussed in the next section of this opinion, that possession of the documents precludes Plaintiffs from demonstrating reasonable reliance upon the oral representations. Although the Alabama Supreme Court discusses "reasonable reliance" in both contexts, the inquiry with regard to the statute of limitations is whether the documents would have put the plaintiff on notice that previously relied upon oral representations were false.

to put a party on notice of fraud because they generally do not directly contradict any representations that were made. *Cf. Envtl. Sys., Inc. v. Rexham Corp.*, 624 So. 2d 1379, 1383 (Ala. 1993) (noting that while merger clauses may be used to invoke the parol evidence rule for contract claims, they may not be exercised "to exclude evidence relating to a fraud claim"). Rather than contradicting representations that were made, merger clauses usually provide that no representations were made in the first place or that any representations that were made are not part of the contract. This is true of each of the merger clauses identified by the Defendants, and thus they are not sufficient to commence the running of the statute of limitations.

Defendants next point to two different documents that they contend put Plaintiffs on notice of the Benefits Fraud: (1) an Assignment Agreement and Use Restriction and (2) the membership directories. The Assignment Agreement and Use Restriction, signed by Plaintiffs in 2004, provides that Wyndham "in its sole discretion, with or without prior notice, may unilaterally expand or limit the point eligibility criteria for the VIP Program." The Court is not persuaded that a document announcing Wyndham's authority to establish VIP Program "eligibility criteria" should have, as a matter of law, put Plaintiffs on notice that Wyndham's alleged promise not change benefits except in Plaintiffs' favor was fraudulent. Plaintiffs do not

maintain that Wyndham did not have the authority to change VIP benefits. Rather, Plaintiffs assert that Wyndham promised it would not exercise that authority to remove the benefits available when Plaintiffs made their purchases. This provision does not directly contradict Wyndham's alleged representation that benefits would not change adversely, and accordingly, does not provide the type of notice necessary for this Court to determine, as a matter of law, that the statute of limitations began to run at the time the Assignment Agreement and Use Restriction was signed.

The Court is likewise unpersuaded by Defendants' argument that the membership directories should have put Plaintiffs on notice that the promises they contend Wyndham made about VIP Program benefits were fraudulent. Defendants have identified a small-print disclaimer appearing at the bottom of a one-page table contained in the yearly membership directories published after 2003. When the disclaimer was first included, it provided that benefits were "subject to change without notice." A subsequent publication provided that benefits were subject to change "or elimination."

Plaintiffs initially argue that the disclaimer should be discredited because it is inconspicuously buried within the membership directories. The disclaimer was perhaps not as openly visible as written statements that other courts have found

sufficiently clear to trigger the statute of limitations. For example, in *Foremost*, the plaintiffs had been "provided with various sales documents . . . all of which" were contrary to the alleged misrepresentation. 693 So. 2d at 414. The Court noted that if the plaintiffs had "read or even briefly skimmed" the documents, they would have known the veracity of the representations. *Id.* at 422. *See also Traylor v. Bell*, 518 So. 2d 719, 720–21 (Ala. 1987) (finding that fraud would have been "easily discovered by even a casual reference . . . to . . . the sales document which [the plaintiff] signed"). However, while the disclaimer in the membership directories was arguably more discrete than written statements discussed in other cases, the Court is unconvinced that this fact alone renders it invalid.

Nonetheless, it was insufficient to put Plaintiffs on notice that the oral representations were fraudulent because the disclaimer did not clearly contradict the alleged representations related to VIP benefits. The alleged fraudulent representation was that Plaintiffs' VIP Program benefits would "not change for the worse." A disclaimer that the benefits are "subject to change" does not necessarily notify Plaintiffs that the changes, if made, would be disagreeable. Furthermore, modifying the disclaimer to include "or elimination" does not change the result. Indeed, given the alleged representation, Plaintiffs might assume that any benefit eliminated would

be paired with a more advantageous replacement. Additionally, there were a host of VIP Program benefits that were never utilized by Plaintiffs and would not have been problematic to eliminate. Thus, because the disclaimer did not clearly contradict the alleged representation, it was not sufficient to commence the running of the statute of limitations.

Defendants have also identified two different documents in Plaintiffs' possession which they argue should have put Plaintiffs on notice about the Rental Fraud. The first is a Statement of Understanding, which was signed in connection with a purchase from Wyndham in 2005. One clause of that document provides that Plaintiffs "have received no advice, nor had any discussion concerning any financial or monetary advantage such as rental income, price appreciation through resale, or tax advantage." The second document is an affidavit, signed in connection with several transactions, stating that Plaintiffs "acknowledge that the purchase . . . was NOT made for investment purposes but to use for pleasure and vacations."

The language from the Statement of Understanding is analogous to the disclaimer clause discussed above because it merely provides that rental income was not discussed. It does not, however, directly contradict the alleged oral representation that Plaintiffs could use their points to operate a rental business with the support of

Wyndham's systems. Accordingly, it would not put Plaintiffs on notice that those representations, if made, were fraudulent. The provision contained in the signed affidavit likewise fails to put Plaintiffs on notice because it simply declares that the purchases were not made for investment purposes. The affidavit, however, does not clearly contradict Wyndham's promises to operate in a manner beneficial to Plaintiffs rental business. In sum, neither of these clauses are sufficient for this Court to conclude, as a matter of law, that Plaintiffs had notice of the alleged Rental Fraud such to begin the running of the applicable statute of limitations.

Defendants next argue that Plaintiffs' claims should be barred by the statute of limitations because the evidence demonstrates that Plaintiffs had actual knowledge of facts that should have alerted them to the falsity of Wyndham's representations. The statute of limitations question may be "decided as a matter of law in cases where the plaintiff had actual knowledge of facts that would have put a reasonable person on notice of the fraud." *Cork*, 426 F. Supp. 2d at 1239. *See also Abston*, 822 So. 2d at 1195 (stating that the statute of limitations begins to run when a plaintiff is privy to facts which would "provoke inquiry in the mind of a [person] of reasonable prudence, and which, if followed up, would have led to the discovery of the fraud").

The Court agrees that the evidence demonstrates that Plaintiffs had knowledge

of facts that should have alerted them to the Benefits Fraud as early as 2006.[15] In mid 2006, Wyndham apparently announced an intention to alter many of the VIP Program benefits regularly utilized by Megarenters. Plaintiffs' knowledge of these changes is revealed by an email they sent to Wyndham shortly before these new changes were set to take effect, wherein Plaintiffs expressed displeasure with the upcoming changes. In the email, Plaintiffs stated that Wyndham was performing a "bait and switch" by rescinding promised benefits (Doc. 132-49 at 20), and by virtue of their actions, Wyndham was "making it pretty clear that they don't want owners like [Plaintiffs] and that they think they can change the VIP rules anytime they want to." (*Id.* at 18.)

Plaintiffs also had knowledge of facts which should have put them on notice about the Rental Fraud more than two years before this suit was filed. There is an identifiable link between VIP Program benefits and Plaintiffs' rental business. For example, Plaintiffs' rental business was achievable in large part because of the availability of VIP Program benefits. Thus, Plaintiffs' knowledge that VIP Program benefits were being removed also put them on notice that Wyndham was repudiating its promise to help Plaintiffs run a rental business. This is evidenced by Plaintiffs own

---

[15] VIP Program benefits had been changed from time to time prior to 2006, and it is possible that Plaintiffs knew about these changes. However, it appears the changes occurring prior to 2006 did not have an adverse impact on Plaintiffs' business, and therefore may not have been noticed by Plaintiffs.

testimony. In his deposition, Mr. Sirmon acknowledged that the Wyndham's 2006 changes to VIP Program benefits appeared to "single[] out" owners running rental businesses. (Sirmon Depo., Vol. 1, Doc 132-50 at 225–26.) He also testified that he recognized Wyndham's removal of unlimited free guest confirmations in 2007 was "a huge change made to put [him] out of business." (Sirmon Depo., Vol. 1, Doc 132-50 at 66.)

Because Plaintiffs were aware as early as 2006 that Wyndham was engaging in conduct directly contradicting the company's alleged representations, the Court finds that the statute of limitations, unless tolled, would have had expired as to Plaintiffs' fraud claims prior to October 7, 2010, the date this lawsuit was filed. Plaintiffs, however, assert that Wyndham should be equitably estopped from asserting the statute of limitations as a defense.[16] Plaintiffs base their estoppel argument on their allegations that Wyndham constantly assured them that changes to VIP Program benefits would not be effective against their accounts, and that Wyndham's agent requested that Plaintiffs allow time for an internal review of their complaints.[17]

---

[16] The appropriate time to address Plaintiffs' estoppel argument is after the Court has determined that the statute of limitations was expired at the time the lawsuit was filed. *See City of Birmingham v. Cochrane Roofing & Metal Co.*, 547 So.2d 1159 (Ala.1989) (addressing the plaintiff's estoppel claim after determining the statute of limitations had expired).

[17] The Court rejects Wyndham's argument that Plaintiffs' estoppel argument should be barred because it was not properly pled. Estoppel must be specially pleaded when it forms the basis

In *City of Birmingham v. Cochrane Roofing & Metal Co.*, the Alabama Supreme Court summarized the law applicable in situations where one party asserts equitable estoppel as a bar to another party's statute of limitations defense:

> In *Mason v. Mobile County*, 410 So. 2d 19 (Ala.1982), this Court held that if a defendant either fraudulently or innocently represents to the plaintiff that he will remedy a problem, and relying on these representations the plaintiff is induced not to file a lawsuit or take any action, the defendant may be estopped from raising the statute of limitations as a defense. Additionally, in *Arkel Land Co. v. Cagle*, 445 So. 2d 858 (Ala.1983), we held that if a defendant represents that a lawsuit is unnecessary because he intends to take care of the problem he is likewise estopped from raising the statute of limitations as a defense.

547 So.2d at 1167.

In *Mason*, the defendant county altered a drainage ditch on the border of the plaintiffs' property which caused the plaintiffs' home to flood when it rained. *Id.* at 20. The plaintiffs immediately contacted the county to complain about the flooding. Although the county assured the plaintiffs the problem would be corrected, no repairs were ever made. The plaintiffs continued to complain over the next year and a half, and each time were informed that a work crew or an engineer would come out to make the necessary repairs. When the plaintiffs finally filed suit more than 3 years later, the

---

of a plaintiff's claim or when it is being asserted as an affirmative defense. Plaintiffs, however, raise their estoppel argument merely to rebut Wyndham's statute of limitations defense. Wyndham has failed to present authority demonstrating that estoppel must be specially pleaded when asserted to preclude a defendant's reliance on the statute of limitations. Accordingly, the Court refuses to bar Plaintiffs' estoppel claim because it was not included in the pleadings.

county asserted the statute of limitations as a defense. The Alabama Supreme Court, however, held that the county was estopped from asserting the statute of limitations because it represented that it would attempt to correct the problem, and plaintiffs relied on those representations in electing not to file their lawsuit. *Id.* at 21.

Similar to *Mason*, Plaintiffs complained to Wyndham in May 2006, immediately upon learning about the proposed adverse changes to VIP Program benefits. A Wyndham representative responded to Plaintiffs' complaint via email: "I know [Wyndham] is looking at another level of ownership called Diamond (2 million points). Maybe this level of ownership will allow us to do what we need and we can re-arrange things. If not, I will find a way around this." (Doc. 132-49 at 18.) In his deposition, Mr. Sirmon testified that Wyndham repeatedly assured him that the changes would not be effective against his account. Moreover, he testified that "Wyndham went back and [reversed the 2006 VIP Program benefit changes] after there was an uproar." (Sirmon Depo., Vol. 1, Doc 132-50 at 64.) Mr. Sirmon offered the same testimony with respect to the 2007 changes, stating "I was being told it was not going to stand and some of the other things they had changed were undone, so I had every reason to believe this would not be a real change either." (*Id.* at 67.)

Wyndham argues that under *Moore v. Nat'l Sec. Ins. Co.*, 477 So. 2d 346, 348

(Ala. 1985), the statements by its representatives "were nothing more than vague assurances" and are insufficient to support an estoppel argument. *Moore*, however, is distinguishable because in that case the only statements ever made by the defendant's representatives were that they were "checking into the problem." *Id*. As the court pointed out, the defendant never assured the plaintiffs they would be satisfied with the outcome or that they would "receive all they believed they were entitled to receive." *Id*. In contrast, Plaintiffs here allege they were assured that they would continue to be afforded the full scope of VIP Program benefits available at the time they made their initial timeshare purchases. Plaintiffs contend that based on the promises of Wyndham's representatives, they remained confident the company would take the steps necessary to return all promised benefits. Although the manner in which the benefits would be restored was never completely defined, the alleged promise to restore benefits was certain. Thus, Wyndham's promises, as alleged by Plaintiffs, were more than mere "vague assurances."

Wyndham additionally argues that Plaintiffs' estoppel argument must fail because they "did not receive any specific promises in exchange for a promise not to sue." (Doc. 169 at 22.) In *Mason*, the Alabama Supreme Court rejected the argument that estoppel can only be utilized if the defendant "actively mislead the plaintiff and

urge[d] him not to file a lawsuit." *Mason*, 410 So. 2d at 21 (citation omitted). The plaintiffs in *Mason* never indicated that they intended to file a lawsuit, nor did the evidence suggest the county gave assurances in exchange for the plaintiffs' promise not to pursue litigation. Nevertheless, the court in *Mason* applied equitable estoppel to preclude the defendants' statute of limitations defense. *Id.* In light of *Mason*, it is apparent that a promise not to pursue litigation is not *always* an essential prerequisite when raising estoppel to avoid the statute of limitations.

The Alabama Supreme Court has held that "application of the doctrine of equitable estoppel must be tempered by applying 'a standard of reasonable reliance.'" *McCormack v. AmSouth Bank, N.A.*, 759 So. 2d 538, 543 (Ala. 1999) (quoting *Cochrane Roofing*, 547 So. at 1167). The "reasonable reliance" standard may place greater emphasis on promises not to sue in certain contexts. Specifically, the Alabama Supreme Court has emphasized promises not to sue in cases where plaintiffs raised estoppel to avoid the statute of limitations in construction cases. *See, e.g.*, *Cochrane Roofing*, 547 So. 2d at 1167 (noting that "none of the defendants' statements or letters can be construed as a promise to make repairs in return for a promise not to sue"); *Jim Walter Homes, Inc. v. Kendrick*, 810 So. 2d 645, 651 (Ala. 2001) (noting that "the record contains no evidence indicating that [the defendant] made, or that [the

plaintiff] relied upon, a promise to repair in return for a promise not to sue").

Cochrane Roofing and Kendrick are both distinguishable from the present case.

In both of those cases, the Alabama Supreme Court recognized that special public

policy concerns govern the estoppel analysis in the construction context:

> [I]n the construction industry it is conceivable that an owner and an architect could continue some form of working relationship for ten or more years after a building was certified to be complete. If estoppel prevented the assertion of the statute of limitations as a defense, then the owner could file suit many years after the contract was completed, claiming that he was unsatisfied with the initial design or construction, but that he had been "induced" not to file suit during the years that the architect was either consulting with him or making repairs. Clearly, estoppel was not meant to defeat the statute of limitations defense in every case where a defendant attempts to remedy problems that might otherwise lead to a lawsuit.
>
> . . . It makes good business sense to maintain a client's goodwill by assisting him in any way possible, even after the formal contractual relationship has ended. If the statute of limitations defense was defeated as to claims regarding the initial design or construction every time an architect or contractor assisted a client after its performance pursuant to the contract was completed, then the architect or contractor would have no incentive to assist the owner with any subsequent business problems; to do so would only extend its liability.

Cochrane Roofing, 547 So. 2d at 1167–68. See also Kendrick, 810 So. 2d at 651.

The type of policy concerns expressed in Cochrane Roofing and Kendrick are

simply not present in this case. Wyndham's promises to restore VIP Program benefits

are not comparable to a builder making a good faith effort to maintain a client's

goodwill by undertaking repairs not required by contract. Instead, Plaintiffs insist that Wyndham's assurance that VIP Program benefits would be restored were nothing more than empty promises intended to placate Plaintiffs while the company continued to implement its strategy to stifle their rental business. Indeed, Wyndham's representative Paul Bonds testified that he knowingly lied to Plaintiffs when he informed them that Diamond level ownership would revive their VIP Program benefits. (*See* Bonds Depo., Doc 146-11 at 201–02.)

Plaintiffs' position is further supported by a review of the exchange of communications between the parties in late 2009. In October 2009, Plaintiffs sent a demand letter to Wyndham threatening legal action. A Wyndham representative responded to Plaintiffs' demand letter, stating that "a substantial amount of research . . . needs to occur," but that the company would respond in a "complete collaborative response." Then, after Plaintiffs agreed to "await a report," the Wyndham representative reported to her team that she had "bought . . . some time with Mr. Sirmon." (Doc. 146-62 at 4.) The response to the 2009 demand letter, standing alone, is perhaps insufficient to support Plaintiffs' estoppel argument. However, the statement by Wyndham's representative that she had "bought some time with Mr. Sirmon," when coupled with the company's repeated promises to restore Plaintiffs'

VIP Program benefits, provides evidence of Wyndham's motive to lull Plaintiffs into inaction.

In evaluating Plaintiffs' estoppel argument, the Court "must balance the purpose of the statute of limitations with the injustice that would result from allowing the defendants to claim it as a defense." *Cochrane Roofing*, 547 So. 2d at 1167. In light of facts and circumstances of this case, the Court finds that injustice would result from refusing to allow a jury to consider whether Defendants should be estopped from asserting the statute of limitations as a defense. Accordingly, Plaintiffs are entitled to have a jury consider their estoppel claim when determining whether the statute of limitations expired prior to the instigation of this lawsuit. As such, Defendants' Motion for Summary Judgment on the grounds of the statute of limitations is due to be denied with respect to Plaintiffs' fraud, fraudulent inducement, and suppression claims.

### ii.    Reasonable Reliance

The Court next addresses Defendants' argument that Plaintiffs' reliance upon the alleged representations was unreasonable as a matter of law. Under Alabama law, there are four basic elements to a fraud claim: (1) there must be a false representation; (2) the false representation must concern a material existing fact; (3) the plaintiff must

rely upon the false representation; and (4) the plaintiff must be damaged as a proximate result. *Cowen v. M.S. Enterprises, Inc.*, 642 So. 2d 453, 456–57 (Ala. 1994) (citing Ala. Code § 6-5-101). With respect to the third element, "a plaintiff must prove that he or she *reasonably relied* on the defendant's misrepresentation in order to recover damages for fraud." *AmerUs Life Ins. Co. v. Smith*, 5 So. 3d 1200, 1207 (Ala. 2008) (emphasis added).

As an initial matter, the Court points out that the analysis with respect to "reasonable reliance" in this section is distinct from the analysis conducted with respect to the statute of limitations. Although the term "reasonable reliance" is used by Alabama courts in both contexts, the inquiry is not entirely the same. At this point in the discussion, the Court is evaluating whether documents received at or prior to the time of the sale were so clear that the plaintiffs could not be said to have "reasonably relied" upon the allegedly false representation in the first instance.

The reasonable reliance standard was reestablished as the appropriate standard for evaluating fraud allegations in *Foremost*. There, the Alabama Supreme Court stated:

> The "reasonable reliance" standard is, in our view, a more practicable standard that will allow the factfinder greater flexibility in determining the issue of reliance based on all of the circumstances surrounding a transaction, including the mental capacity, educational background,

relative sophistication, and bargaining power of the parties. In addition, a return to the "reasonable reliance" standard will once again provide a mechanism . . . whereby the trial court can enter a judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms.

*Foremost*, 693 So. 2d at 421.

Under *Foremost*, a plaintiff's reliance can be declared unreasonable, as a matter of law, when the undisputed evidence indicates that the plaintiff "made a deliberate decision to ignore written contract terms that *clearly contradicted* the alleged misrepresentations." *Massey Automotive, Inc. v. Norris*, 895 So. 2d 215, 220 (Ala. 2004) (emphasis added) (discussing *Foremost*, 693 So. 2d at 421). Importantly, however, a court cannot decide a claim as a matter of law simply because there is a written agreement remotely on point. Rather, Alabama case law demonstrates that courts only remove the fraud question from the purview of the jury when the written documents are undeniably inconsistent with the representations made by the defendant. *See, e.g.*, *Foremost*, 693 So. 2d at 421–22; *Smith*, 5 So. 3d at 1208; *Alfa Life Insurance Corp. v. Green*, 881 So. 2d 987, 988–89 (Ala. 2003).

In *Foremost*, the defendant represented to the plaintiffs that their first year of insurance coverage would not require the payment of a premium. 693 So. 2d at 414.

Notwithstanding this representation, the plaintiffs signed and were provided with various sales documents, all of which clearly indicated that premiums were charged for the first year's coverage. *Id.* The court noted that if the plaintiffs had "read or even briefly skimmed" the documents, they would have recognized the inconsistency. *Id.* at 422. Accordingly, the court stated that the plaintiffs' claim failed to satisfy the objective reasonable reliance standard. *Id.*

In *Smith*, the plaintiff claimed that his insurance agent orally represented that his life insurance premiums would remain level and the policies would remain in force for 42 years, or until the plaintiff was age 95. *Smith*, 5 So. 3d at 1202. However, the annual statements for the policies reflected that if only the planned premiums were paid, the policies would terminate after 26 years. *Id.* at 1203. Additionally, each policy contained a disclaimer providing that coverage may end before the insured reached age 95. *Id.* Given that the documents clearly indicated that the plaintiff's insurance coverage would expire before he reached age 95, the court held "no reasonable person could read the policies . . . and not be put on inquiry as to the existence of inconsistencies., thereby making reliance on [the defendant's] representations unreasonable as a matter of law." *Id.* at 1216.

In *Green*, the plaintiffs alleged that an insurance agent had represented to them

that they would be required to make only nine annual premium payments for a life-insurance policy. 881 So. 2d at 988–89. However, the insurance company presented evidence that the plaintiffs had received a two-column premium schedule, one column showing the number of premiums they would have to pay if the interest rates remained the same, and one showing that premiums would be required for more than nine years if interest rates changed. *Id.* at 989. The court held that the insurance company was entitled to judgment as a matter of law because, given the unambiguous premium schedule, the plaintiffs could not show they reasonably relied on the alleged oral representations. *Id.* at 992–93.

In each of these cases, the documents in the plaintiffs' possession were undeniably inconsistent with the alleged misrepresentations. *See also Cook's Pest Control, Inc. v. Rebar*, 28 So. 3d 716, 727 (Ala. 2009) (holding that plaintiffs did not demonstrate reasonable reliance where the "written terms *clearly contradicted* the alleged representation); *Traylor v. Bell*, 518 So. 2d 719, 720–21 (Ala. 1987) (finding that fraud would have been "easily discovered by even a casual reference by [the plaintiff] to . . . the sales document which he signed"). In essence, these are situations where the defendant said "east" and the document said "west." However, without a document presenting such a direct contradiction, the reasonable reliance question

should be resolved by the jury at trial.

The Court now turns to the case *sub judice*. Defendants have not presented evidence that Plaintiffs possessed documents at or prior to the time of the individual transactions that contained the type of unmistakable contradiction necessary for the Court to decide reasonable reliance as a matter of law. Defendants first argue that the disclaimers in the membership directories stating that benefits were "subject to change" should defeat Plaintiffs' assertion that they reasonably relied upon the oral representations. The disclaimers, however, were not included in the membership directories until the 2003 publication. Accordingly, the disclaimers would certainly not defeat reasonable reliance upon representations made in connection with purchases before 2003.

Furthermore, the disclaimers are also insufficient to defeat reasonable reliance with respect to transactions occurring after 2003 because they did not necessarily contradict Wyndham's alleged promise to not make adverse changes to VIP Program benefits. As discussed above, the disclaimers simply announced Wyndham's authority to make changes. Wyndham, however, never stated that it did not have the authority to change VIP benefits. Rather, the alleged representation was that Wyndham would not exercise its authority to make changes detrimental to Plaintiffs. Since the

disclaimer does not directly contradict that representation, it was not unreasonable for Plaintiffs to ignore the disclaimer when relying on Wyndham's alleged promise that it would not adversely change Plaintiffs' VIP benefits.

Defendants next argue that Plaintiffs cannot establish reasonable reliance upon any representations related to Plaintiffs' rental operations because Plaintiffs signed affidavits and other contract documents providing that the purchases were made without expectation of financial benefit. These documents, however, are similarly insufficient to remove the reasonable reliance inquiry from the jury. The affidavits and other documents referred to by Defendants do not directly contradict the alleged promises that Plaintiffs could use their points to operate a rental business with the support of Wyndham's systems. Rather, these documents simply announce that the Plaintiffs' purpose was to purchase points for pleasure and not investment. Since these documents do not clearly contradict the alleged misrepresentation, Plaintiffs have not failed, as a matter of law, to establish reasonable reliance. Accordingly, a jury will determine the issue.

### iii.   Merger Clauses

Defendants next argue that merger clauses within the timeshare contracts should defeat Plaintiffs' fraud claims as a matter of law. Defendants, however, have

failed to present binding authority directly supporting this argument. The two primary cases cited by Defendants were rendered by courts applying the law of states other than Alabama. And one of those decisions, *Korff v. Hilton Resorts Corp.*, 797 F. Supp. 2d 875 (N.D. Ohio 2011), was recently reversed by the Sixth Circuit in an opinion released shortly after briefing for this matter concluded. *See Korff v. Hilton Resorts Corp.*, 2012 WL 5951480 (6th Cir. Nov. 28, 2012) (reversing the district court's decision that a merger clause barred the plaintiff's fraud claim).

The Alabama Supreme Court has specifically addressed this issue. In *Downs v. Wallace*, the court stated:

> [T]his Court has never held that an integration clause such as the one contained in the [plaintiff's] purchase agreement renders a party's reliance on oral representations unjustifiable, or unreasonable, as a matter of law. To the contrary, this Court has consistently held that although a written contract stipulates that there were no oral understandings not incorporated therein, such a stipulation does not foreclose a party, as a matter of law, from establishing his reliance on fraudulent representations that induced him to enter the contract. This holding ensues from the rule that when an agreement has been induced by deliberate fraud, the written document reciting that agreement is void and is "of no more binding efficacy . . . than if it had no existence, or were a piece of waste paper."

622 So. 2d 337, 341 (Ala. 1993) (internal citations omitted) (quoting *Drinkard v. Embalmers Supply Co.*, 14 So. 2d 585, 587 (Ala. 1943)). "Therefore, the existence of a general [merger] clause in the purchase agreement does not, as a matter of law,

preclude [a plaintiff] from justifiably relying on alleged oral representations that were not contained in the contract." *Envtl. Sys., Inc. v. Rexham Corp.*, 624 So. 2d 1379, 1385 (Ala. 1993) (discussing *Downs*).

Nonetheless, Defendants argue that the "fraud in the inducement exception" discussed in *Downs* and *Environmental Systems* is no longer applicable because Alabama has abandoned the fraud-in-the-inducement exception to the statute of frauds. *See Bruce v. Cole*, 854 So. 2d 47 (Ala. 2003); *Nix v. Wick*, 66 So. 3d 209, 218 (Ala. 2010). Alabama's statute of frauds provides:

> In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:

> (5) Every contract for the sale of lands, tenements or hereditaments, or of any interest therein, except leases for a term not longer than one year, unless the purchase money, or a portion thereof is paid and the purchaser is put in possession of the land by the seller.

Ala. Code § 8-9-2.

The Court is not persuaded that the statute of frauds applies to the representations underlying Plaintiffs' fraud allegations. As an initial matter, the Court notes that Defendants failed to assert their statute of frauds argument until their reply

brief.[18] As such, their statute of frauds argument is waived. *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (stating that a claim that was included in pleadings but not again raised until the plaintiff's supplemental reply brief is abandoned). However, even if properly asserted, Defendants' statute of frauds argument is without merit because the statute of frauds is inapplicable to the representations forming the basis of Plaintiffs' fraud claims.

The Alabama Supreme Court has held that claims alleging oral misrepresentations concerning benefits associated with the purchase of a timeshare are not governed by the statute of frauds. *See Alpine Bay Resorts, Inc. v. Wyatt*, 539 So. 2d 160 (Ala. 1988). In *Alpine Bay*, the plaintiff purchased a "fixed week" timeshare interest. The plaintiff alleged that Alpine represented that the unit would be available during a specified week each year and that they would receive a charter golf membership entitling them to reduced fees at the resort golf course. The plaintiff later filed suit when these representations proved false. Alpine argued that the representations were void by the statute of frauds because they concerned or related to the conveyance of an interest in land. The Alabama Supreme Court rejected this

---

[18] Although Defendants' included the statute of frauds as a defense in their answer (Doc. 7 at 15), they did not again assert the statute of frauds until their reply brief in support of their Motion for Summary Judgment.

argument, holding that the promise to have the unit available for a certain week "was not and cannot be characterized as an oral contract for the sale of land within the meaning of Code 1975, § 8–9–2(5)." *Alpine Bay*, 539 So. 2d at 164.

While it may be true that Alabama has abandoned the fraud in the inducement exception to the statute of frauds, the representations underlying Plaintiffs' fraud claims are not governed by the statue of frauds. As in *Alpine Bay*, Plaintiffs' fraud allegations relate to benefits tangentially associated with their timeshare interest. The representations did not directly relate to any conveyance of realty and were not for the "sale of land." Under *Alpine Bay*, it is clear these representations are not covered by the statute of frauds. And because the representations are not covered by the statute of frauds, the rule announced in *Bruce* and its progeny is not applicable to this dispute.

Second, this transaction falls within an exception expressly set out in the statute. The statute of frauds does not apply if "the purchase money, or a portion thereof is paid and the purchaser is put in possession of the land by the seller." Ala. Code § 8-9-2(5). In this case, Plaintiffs paid the full purchase money for their timeshare points, and were "put in possession" by both receiving the points and using the properties associated with those points. Although Defendants assert this exception does not apply, they have failed to cite any authority explaining their reasoning.

Accordingly, the Court concludes the "purchase money" exception would remove this transaction from the statute of frauds.

Since the statute of frauds does not apply to this action, the rule announced in *Downs* and *Environmental Systems* controls the Court's analysis of the merger clauses. These two cases clearly provide that, under Alabama law, the merger clauses in the timeshare contracts do not defeat Plaintiffs' fraud claims. Accordingly, summary judgment is due to be denied as to Defendants' argument with respect to the merger clauses and the statute of frauds.

### B.    Fiduciary Duty

Count VI of Plaintiffs' complaint asserts a claim for breach of fiduciary duties. Defendants contend that Plaintiffs cannot establish the type of close confidential relationship with Wyndham and its agents necessary to support a claim for breach of fiduciary duties.

The Alabama Supreme Court has held that fiduciary relationships are "not restricted to such confined relations as trustee and beneficiary, partners, principal and agent, guardian and ward, managing directors and corporation, etc." *Line v. Ventura*, 38 So. 3d 1, 12 (Ala. 2009) (internal citations omitted). Rather, the responsibilities of a fiduciary flow to "all persons who occupy a position out of which the duty of good

faith ought in equity and good conscience to arise. It is the nature of the relation which is to be regarded, and not the designation of the one filling the relation." *Id.* at 12–13. A fiduciary relationship is one in which:

> one person occupies toward another such a position of adviser or counselor as reasonably to inspire confidence that he will act in good faith for the other's interests, or when one person has gained the confidence of another and purports to act or advise with the other's interest in mind; where trust and confidence are reposed by one person in another who, as a result, gains an influence or superiority over the other; and it appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side, there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible. It arises in cases in which confidence is reposed and accepted, or influence acquired, and in all the variety of relations in which dominion may be exercised by one person over another.

*Id.* at 13 (quoting *Bank of Red Bay v. King*, 482 So. 2d 274, 284 (Ala. 1985)).

After due consideration, the Court concludes that there is insufficient evidence to justify the imposition of a fiduciary duty owed to Plaintiffs by Wyndham and its agents. Although a fiduciary relationship may exist outside the traditional contexts, i.e., principal-agent, attorney-client, etc., the Court does not believe the present case presents such a situation.

The Alabama Supreme Court's recent decision in *Maloof v. John Hancock Life Ins. Co.*, 60 So. 3d 263 (Ala. 2010), is instructive on Plaintiffs' fiduciary duty claim.

In *Maloof*, the plaintiffs argued that a fiduciary relationship existed with their insurance agent because "for many years, [the plaintiffs] entrusted their financial affairs and estate planning needs to [the agent]." *Id.* at 273. The court, however, found the plaintiffs' contention that they had a trusting and confidential relationship was belied by their own testimony indicating that they understood the transactions to be at arms-length and that they recognized the agent was simply a salesman selling a product. The court concluded that the plaintiffs "did not view their relationship with [defendant], though cordial and long-standing, as anything special or outside the typical salesperson-customer relationship." *Id.* at 274. As such, there could be no fiduciary relationship.

There is no question that Plaintiffs maintained a long-standing and active relationship with Wyndham and its representatives. However, as in *Maloof,* the relationship between Wyndham and Plaintiffs, at its core, was merely one between a seller and a buyer. Plaintiffs purchased timeshare interests from Wyndham after meeting with sales representatives, sitting through sales presentations, and engaging in arms-length negotiations. There is no reason to believe Plaintiffs failed to understand Wyndham was selling its product, and not necessarily looking out for their best interest.

Moreover, like the plaintiffs in *Maloof*, Plaintiffs repeatedly made comments suggesting that they did not view Wyndham in a fiduciary capacity. In 2007, Plaintiffs wrote an email stating "I don't trust Wyndham's top decision makers as far as I can throw them[.] . . . [They] seem intent on taking away one thing after another after they advertise and sell them a different way up front." (Doc. 139-42 at 6.) In a later email, Plaintiffs stated they were "very contemptuous as to how the people at the top of the company do business." (Doc. 132-49 at 10.) These distrusting and critical comments about the defendant companies indicate that Plaintiffs did not view Wyndham and its agents as fiduciaries.

Plaintiffs argue that they placed genuine trust in Wyndham's representatives, which was "developed over the course of many years and countless conversations." (Doc. 145 at 54.) However, it is not enough to simply assert that a trusting relationship existed. "'[M]ere subjective trust' . . . is insufficient to establish [a fiduciary] relationship." *Hopkins v. Hopkins*, 983 So. 2d 382, 391 (Ala. Civ. App. 2007 (quoting Roy Ryden Anderson, *The Wolf at the Campfire: Understanding Confidential Relationships*, 53 SMU L. Rev. 315 (2000)). Rather, "the claimant must show not just that he trusted the other party, but that he trusted him to act as a fiduciary." *Id.* "Further, reposing that level of trust must have been reasonable under the

circumstances. It is the lack of this reasonableness that has caused so many courts to refuse to find in favor of a confidential relationship." *Id.*

Even accepting that Plaintiffs placed "subjective trust" in Wyndham and its representatives, they still have not demonstrated the type of objective and reasonable trust necessary to establish a fiduciary relationship. There is no evidence suggesting that Wyndham possessed an "overmastering influence" over Plaintiffs, such as holding unique information about their financial affairs. *Line*, 38 So. 3d at 13. There is also no indication that Plaintiffs acted in a state of "weakness, dependence, or trust, justifiably reposed," such that they would make purchasing decisions without thoughtfully considering the implications. *Line*, 38 So. 3d at 13. To the contrary, there is a general understanding that the motivations of sellers and buyers are not perfectly aligned and that sellers are acting in their own self-interest. Accordingly, it would not have been reasonable for an individual in Plaintiffs' position to assume that a developer selling its own product was acting in a fiduciary capacity.

Plaintiffs attempt to bolster their breach of fiduciary duty claim by arguing that Wyndham garnered influence through "specific and targeted marketing." (Doc. 145 at 55.) They further argue that their purchases were only made after "repeated suggestions by Wyndham salespersons." *Id.* But specific and targeted marketing is

characteristic of all prudent sellers. The mere fact that a seller obtains information about and specifically targets a specific customer base does not prevent a transaction from being at arms length. Although salesmen do not have license to engage in fraud, they are not held to the high standard of a fiduciary. Because Plaintiffs have failed to establish the existence of a fiduciary relationship, summary judgment is due to be granted in favor of Defendants on Plaintiffs' breach of fiduciary duty claims.

## C.    Fraudulent Suppression

In Count III of their complaint, Plaintiffs allege that Defendants fraudulently suppressed the fact that they were developing and implementing a strategy to prevent owners from operating rental businesses with their points. Under Alabama law, there are four elements to a claim for fraudulent suppression. "[T]he plaintiff must show 1) that the defendant had a duty to disclose material facts, 2) that the defendant concealed or failed to disclose those facts, 3) that the concealment or failure to disclose induced the plaintiff to act; and 4) that the defendant's action resulted in harm to the plaintiff." *Lawson v. Harris Culinary Enterprises, LLC*, 83 So. 3d 483, 492 (Ala. 2011) (internal citation omitted). Defendants contend that Plaintiffs' suppression claim fails for the same reasons as their breach of fiduciary duty claim. Specifically, Defendants argue that without a fiduciary relationship there cannot be

a duty to disclose. Thus, Defendants argue that Plaintiffs cannot satisfy the first element of their cause of action.

As an initial matter, Defendants' assertion that a duty to disclose only exists when there is a fiduciary relationship is incorrect. Alabama's codification of the tort of fraudulent suppression provides that "[t]he obligation to communicate may arise from the confidential relations of the parties *or from the particular circumstances of the case.*" Ala. Code § 6-5-102 (emphasis added). Thus, the statute "creates a way of finding a duty outside the narrower 'confidential relations' approach, by allowing the court to broaden its analysis into the facts surrounding the transaction." *State Farm Fire & Cas. Co. v. Owen*, 729 So. 2d 834, 839 (Ala. 1998).

"The question whether a party had a duty to disclose is a question of law to be determined by the trial court." *Barnett v. Funding Plus of Am., Inc.*, 740 So. 2d 1069, 1074 (Ala. 1999). The Court must consider and apply the following factors in determining whether, under the particular circumstances, a duty to disclose exists: (1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; and (4) the plaintiffs' opportunity to ascertain the fact.[19] *Owen*,

---

[19] The court in *Owen* also listed "customs of the trade" and "other relevant circumstances" as factors to be considered. 729 So.2d at 843. However, because these factors are inapplicable in the context of this case, they are excluded from the Court's analysis.

729 So.2d at 842–43; *Davis v. Sterne, Agee & Leach, Inc.*, 965 So. 2d 1076, 1091 (Ala. 2007) ("A duty to speak depends on the relation of the parties, the value of the particular fact, the relative knowledge of the parties, and other circumstances.").

The analysis begins with an evaluation of the relationship of the parties. Although the interactions between Wyndham and Plaintiffs did not rise to the level of a fiduciary relationship, that does not mean the relationship was entirely insignificant. The relationship between Wyndham and Plaintiffs developed over the course of many years. Plaintiffs regularly spoke and transacted with the same Wyndham employees, many of which held high-ranking positions of leadership within the company. According to Plaintiffs, Wyndham's agents regularly encouraged them to purchase additional points and use those points to operate a for-profit rental business. And in response to those suggestions, Plaintiffs contend that they expended hundreds of thousands of dollars purchasing timeshare points. Over time, Plaintiffs accumulated enough points to become some of Wyndham's largest owners worldwide. This evidence indicates a long-standing and active relationship which was more consequential than the typical buyer-seller relationship.

The Court next considers the relative knowledge of the parties. Plaintiffs contend that Wyndham, and only Wyndham, had information about the alleged

strategy to eliminate Megarenters. Plaintiffs have submitted enough evidence for a reasonable jury to accept their contention. Although Plaintiffs recognized policy changes which negatively impacted their rental operations, a jury could determine that Plaintiffs were not aware that these changes were part of a comprehensive plan to restrict Megarenters' operations. Plaintiffs allege that even while Wyndham was developing a strategy to eliminate Megarenters, it was continuing to encourage Plaintiffs to purchase more points for use in their rental business. If true, this would indicate that Wyndham was still supportive of Plaintiffs' rental operations. Furthermore, Plaintiffs allege that Wyndham's representatives assured them that the negative policy changes would not remain in effect. If a jury accepts Plaintiffs' allegations, it could well conclude that Wyndham had exclusive knowledge about the alleged strategy to eliminate Megarenters, a fact which would weigh in favor of a duty to disclose.

Third, the court considers the value of the facts allegedly suppressed. In this case, the value of the information about Wyndham's plan, if true, is considerable. Plaintiffs already possessed significantly more timeshare points than any single individual or family could ever personally use. Thus, without the ability to continue operating a profitable rental business, the points Plaintiffs were purchasing were

arguably far less valuable.

Finally, the Court considers Plaintiffs' opportunity to ascertain the allegedly suppressed facts. Plaintiffs could not ascertain the allegedly suppressed information on their own because, if Wyndham actually developed a plan to eliminate Megarenters, such information would have been in the exclusive control of the timeshare company. This situation is not comparable to that of a used car seller withholding information which could be detected through an independent inspection. Nor was the information allegedly suppressed the type of information which could be obtained through diligent online research. Rather, information about Wyndham's alleged plan was only available to those within the company's employ. As discussed above, while Plaintiffs were aware of individual policy changes, it does not follow that they should have recognized that the changes were part of a more comprehensive scheme.  Furthermore, Plaintiffs submitted evidence that whenever they inquired about the negative policy changes, Wyndham would dismiss their fears and assure them everything would work out in the end. This evidence supports Plaintiffs' position that they did not have an adequate opportunity to learn exactly what Wyndham intended.

Evaluating these factors and considering the applicable law, the Court

concludes that Plaintiffs have submitted enough evidence that a reasonable jury could find a duty to disclose. If a jury concludes that Wyndham (1) was in fact developing and implementing a plan to stop owners from renting their points and (2) continued to employ the rental pitch when selling points to Plaintiffs, then Wyndham would have had a duty to disclose information about its plan at the time it was making the sales.

Regardless, Plaintiffs' suppression claim will be limited to transactions occurring after Wyndham made the decision to put the Megarenter Strategy into effect. Plaintiffs made numerous purchases from Wyndham over a period spanning nearly a decade, beginning in 1999, and continuing through April 2008. However, if the alleged Megarenter Strategy actually existed, it was likely not formulated until 2005. Because Plaintiffs' suppression claim is based upon Wyndham's failure to disclose information about the alleged Megarenter Strategy, it cannot be asserted with regard to transactions that occurred before the date whereupon the jury determines the Megarenter Strategy came into existence.

### D.   Civil Conspiracy to Commit Fraud, Fraudulent Inducement, and Suppression

Count XIII of Plaintiffs' complaint asserts a claim for civil conspiracy to commit fraud, fraudulent inducement, and suppression. Defendants argue that this claim should be dismissed pursuant to the two year statute of limitations. Defendants are

correct that the statute of limitations on the conspiracy claims expired before the filing of this lawsuit. Indeed, the same facts that put Plaintiffs on notice of the fraud also put them on notice of any conspiracy to commit fraud. However, notwithstanding the expiration of the statute of limitations, the Court has already concluded that Plaintiffs may present evidence to the jury that Defendants should be estopped from raising the statute of limitations as a defense with respect to their fraud-based claims. Plaintiffs' estoppel argument on their fraud claims applies equally to their claims for civil conspiracy to commit fraud. Accordingly, summary judgement is due to be denied on Plaintiffs' conspiracy claims.

### E.    Breach of Contract

Count IV of Plaintiffs' complaint asserts a claim for breach of contract. "The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." *Reynolds Metals Co. v. Hill*, 825 So. 2d 100, 105 (Ala. 2002). Defendants argue that Plaintiffs' breach of contract claim should be dismissed because they have failed to make out a prima facie case. Specifically, Defendants contend that summary judgment is due to be granted because Plaintiffs have failed to identify any actual contractual provision that was breached.

It appears that Plaintiffs' breach of contract claim is based upon the same oral representations that form the basis of their fraud claims. Defendants assert that application of the parole evidence rule precludes these representations from being considered by the Court. In *First Commercial Bank v. Spivey*, the Alabama Supreme Court explained the purpose behind the parole evidence rule:

> The applicability of the parol evidence rule necessarily rests upon the existence of a valid written instrument that completely and accurately expresses the obligations assumed by or imposed upon the parties. The very purpose of the parol evidence rule is to protect the verity of such an instrument.

694 So. 2d 1316, 1326 (Ala. 1997). "[T]he parol evidence rule does not apply to every contract of which there exists written evidence; it applies, instead, only when the parties to an agreement reduce it to writing, and agree or intend that the writing shall be their complete agreement." *Spivey*, 694 So. 2d at 1326-27. When the parole evidence rule applies, oral representations must be excluded when considering a claim for breach of contract.

Here, the parties not only reduced their agreements to writing, they also explicitly agreed that the writings would be the complete agreement and that oral representations would not have any contractual effect. The following provision is exemplary of the type of merger clauses included throughout the contract documents:

> This agreement supersedes any and all understandings and agreements between You and Us, and You and We mutually agree that this Agreement represents the entire Agreement between You and Us, and any representation or inducement which is not set forth in this Agreement shall be of no force and/or effect. This Agreement may only be amended or modified by an instrument in writing between the parties.

(Doc. 132-7 at 50 ¶ 17.)

This and other similar provisions clearly provide that oral representations will not be honored. These merger clauses trigger application of the parol evidence rule to preclude oral representations from being considered in a claim for breach of contract. *See Envtl. Sys., Inc. v. Rexham Corp.*, 624 So. 2d 1379 (Ala. 1993) (noting that while merger clauses  may not be exercised to exclude evidence relating to a fraud claim, they may be used to invoke the parol evidence rule for contract claims). Thus, the Court will be restricted to the written agreements when evaluating Plaintiffs' breach of contract claim.

Because the oral representations are excluded by the parole evidence rule, Plaintiffs must identify a written contract term that has been violated. *S. Exposition Mgmt. Co. v. Univ. Auto Sales, Inc.*, 740 So. 2d 992, 994 (Ala. 1998) ("To support a breach-of-contract claim, a plaintiff must show the existence of a contract, the defendant's breach of a specific term of that contract, and damage resulting from that breach. A plaintiff may not support his claim with evidence that is barred by the parol

evidence rule."). The Court agrees with Defendants that Plaintiffs have failed to identify any written contractual term that has been violated. Indeed, Plaintiffs have not identified any specific contractual provision in their pleadings or in their brief with respect to this motion for summary judgment. Thus, Plaintiffs have failed to make out a prima facie case for breach of contract, and summary judgment is due to be granted on their breach of contract claim.

### F.    Remaining Claims: Negligence; Wantonness; Negligent and Wanton Hiring, Training, and Supervision; and Unjust Enrichment

Defendants assert that Plaintiffs' remaining claims—i.e., negligence (Count VII); wantonness (Count V); negligent and wanton hiring, training, and supervision (Counts VIII and IX); and unjust enrichment (Count X)—should each be dismissed pursuant to the two year statute of limitations. Alabama provides a two year statue of limitations for each of these claims. *See* Ala. Code § 6-2-38. Thus, Plaintiffs' claims are barred by the statute of limitations if their injuries accrued more than two years before the filing of this lawsuit.

The Court begins by addressing Plaintiffs' negligence claim. Plaintiffs' assert in their complaint that Wyndham was negligent in its performance of its contractual responsibilities. Specifically, Plaintiffs argue that Wyndham operated a reservation system that was incapable of handling the volume of bookings being made and that

Wyndham's departments responsible for fixed week conversions could not handle the volume of purchases made by Plaintiffs. (Doc. 60 at ¶¶ 75–81.)

The Court agrees that Plaintiffs' negligence claim is barred by the statute of limitations. Indeed, the face of Plaintiffs' complaint demonstrates that the 2-year statute of limitations had elapsed. The complaint explicitly provides that "Wyndham is two to four years behind on Plaintiffs' fixed week conversions." (Doc. 60 at ¶ 78.) Furthermore, the evidence submitted by the parties indicates that the problems identified in Plaintiffs' complaint existed well before October 7, 2008. Plaintiffs sent a litany of email complaints to Wyndham detailing the problems with the reservation system. In December 2005, Plaintiffs complained that "[t]he online system is virtually worthless." (Doc. 132-49 at 104.) Plaintiffs complained again one month later: "I would list a couple of dozen reasons why the [Wyndham] online system is one of the most excruciatingly slow and frustrating things a person can deal with in their lifetime but I have been doing that over the last year with no discernable improvements." (*Id.* at 114.) In May 2006, Plaintiffs stated that "[t]he system is unstable, unreasonably slow, and gets maybe a 2 out of 10 for being functionally effective on a consistent basis." (*Id.* at 78.) And in January 2008, Plaintiffs wrote: "It doesn't look like Wyndham is ever going to get their computer system into the 21st Century." (*Id.* at

117.) These are just a small sample of the complaints Plaintiffs made before October 7, 2008, and are enough for the Court to determine the statute of limitations expired on Plaintiffs' negligence claim before this lawsuit was filed.

Plaintiffs argue that "for the same reasons given [for the fraud claims]," Defendants should be equitably estopped from raising the statute of limitations as a defense to their negligence claim. (Doc. 145 at 64.) However, unlike with the fraud claims, Plaintiffs have not submitted evidence to support their estoppel theory. As acknowledged by Plaintiffs' complaints, there is no indication that Wyndham's online reservation system ever demonstrated improvement. In January 2006, Plaintiffs stated "I have been [complaining about the system] over the last year with no discernable improvements." (Doc. 132-49 at 114.)  Similarly, on May 10, 2006, Plaintiffs stated "[n]othing has really happened over the last two years of reporting [these problems] but here goes again anyways." (Doc. 132-49 at 78.) With respect to the fraud claims, Plaintiffs put forth evidence that Wyndham backtracked on many of its changes to the VIP benefits, providing hope that things would all work out as they were promised. The same cannot be said about the problems with the reservation system.

Further, unlike with the fraud claim, the evidence does not demonstrate that Wyndham strung Plaintiffs along with hopes that everything would soon improve.

While at times Wyndham suggested it was exploring the issues, it never promised that the system would soon be able to accommodate Plaintiffs' activity. In fact, Wyndham bluntly stated the opposite. On May 16, 2006, a member of Wyndham's internet team wrote to Plaintiffs:

> I am going to give it to you straight. You will not be able to use this account online until the next system wide memory purge. There simply is not enough memory on your account, and we cannot just purge your history. This means that you will be dependant on the phone counselors for the short term. I wish I had better news, but the online system was not designed to handle the number of reservations booked on your account.

(Doc. 132-49 at 134.) Thus, at least as early as May 2006, Plaintiffs were put on notice that the system was not built for their level of activity and that they should not expect the system to function as they hoped.

The Court finds that the statute of limitations expired on Plaintiffs' negligence claims before the filing of this lawsuit. Additionally, the Court finds that Plaintiffs failed to adequately support their argument that Defendants should be equitably estopped from asserting the statute of limitations as a defense. Accordingly, summary judgment is due to be granted on Plaintiffs' negligence claim.

The analysis with respect to Plaintiffs' negligence claim applies equally to Plaintiffs' claims for wantonness, negligent and wanton hiring, training and

supervision, and  unjust enrichment. Because each of these claims are based on injuries which accrued more than two years prior to the filing of this action, the statute of limitations has expired as to each one. Further, Plaintiffs have not submitted evidence necessary to support their argument that Defendants should be estopped from raising the statute of limitations as a defense. Plaintiffs bear the burden of presenting enough evidence to support their estoppel argument. Although Plaintiffs presented evidence that Defendants should be estopped from raising the statute of limitations with respect to their fraud claims, they have not presented similar evidence with respect to their claims for wantonness, negligent and wanton hiring, training and supervision, and  unjust enrichment. Despite Plaintiffs' assertion to the contrary, the evidence required for each of these claims is not identical. Because Plaintiffs have failed to adequately support their estoppel argument with respect to their claims for wantonness, negligent and wanton hiring, training and supervision, and  unjust enrichment, summary judgement is due to be granted as to each of these claims.

## V.    Conclusion

For the reasons described above, Defendants' motions for summary judgment (Docs. 124 and 127) are due to be GRANTED, and Defendants' motion for summary judgment (Doc. 130) is due to be GRANTED in part and DENIED in part.

The following Alabama state law claims are due to be DISMISSED with prejudice:

(1)     All claims asserted by Plaintiffs Brannon and Spencer Sirmon;

(2)     All claims asserted against Defendant RCI, LLC;

(3)     Plaintiffs Richard and Cynthia Sirmon's claim for breach of contract (Count IV);

(4)     Plaintiffs Richard and Cynthia Sirmon's claim for wantonness (Count V);

(5)     Plaintiffs Richard and Cynthia Sirmon's claim for breach of fiduciary duty (Count VI);

(6)     Plaintiffs Richard and Cynthia Sirmon's claim for negligence (Count VII);

(7)     Plaintiffs Richard and Cynthia Sirmon's claim for negligent hiring, training, and supervision (Count VIII);

(8)     Plaintiffs Richard and Cynthia Sirmon's claim for wanton hiring, training, and supervision (Count IX);

(9)     Plaintiffs Richard and Cynthia Sirmon's claim for unjust enrichment (Count X).

The following claims will proceed at this time:

(1)     Plaintiffs Richard and Cynthia Sirmon's claim for fraud (Count I);

(2)     Plaintiffs Richard and Cynthia Sirmon's claim for fraudulent inducement (Count II)

(3)     Plaintiffs Richard and Cynthia Sirmon's claim for fraudulent suppression (Count III);

(4)     Plaintiffs Richard and Cynthia Sirmon's claim for civil conspiracy to commit fraud, fraudulent inducement, and fraudulent suppression (Count XIII).

A separate order will be entered consistent with this opinion.

Done this 4th day of February 2013.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

[170956]